042716Lf

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| JOLENE R. BUCHHEIT, | |
| Plaintiff, | No. 15 cv 98 EJM |
| vs. | ORDER |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

Plaintiff brings this action seeking judicial review of the Commissioner's denial of her application for social security disability income benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §416. Briefing concluded April 25, 2016. The court has jurisdiction pursuant to 42 USC §405(g). Affirmed.

Plaintiff asserts the Administrative Law Judge (ALJ) (1) failed to properly asses the medical opinion of her treating physician, and (2) erred in assessing Buchheit's narcolepsy and cataplexy when formulating the Residual Functional Capacity (RFC.) Plaintiff asserts that the Commissioner's decision is thus not supported by substantial evidence on the record as a whole.

> [R]eview of the agency decision is limited to whether there is substantial evidence on the record as a whole to support the [Commissioner's] decision...Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.

Robinson v. Sullivan, 956 F2d 836, 838 (8th Cir. 1992).

Plaintiff's doctor, Andrew Peterson, M.D., completed the Narcolepsy/Cataplexy Residual Functional Capacity Questionnaire on April 28, 2012 at the request of plaintiff's attorney (Tr. 428-431). An ALJ must give a treating physician's opinion controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence. 20 C.F.R. § 404.1527(c); House v. Astrue, 500 F.3d 741,744 (8th Cir. 2007).

Dr. Peterson opined that plaintiff was diagnosed with "classic narcolepsy with cataplexy", with three-to-four episodes per week, each lasting 10-15 seconds (Tr. 428). Dr. Peterson further opined that plaintiff's episodes were likely to disrupt her coworkers and she would need more supervision than an unimpaired worker (Tr. 430). He said plaintiff could not work at heights or with power machines that required an alert operator, and she was very limited in operating a motor vehicle (Tr. 430). He also said plaintiff could not work any hours per day and would need to lie down four-to-five times a day at unpredictable intervals (Tr. 430). Dr. Peterson believed stress set off plaintiff's cataplexy, and thus opined her ability to deal with the stress of even a typically low stress job was poor (Tr. 430-31). He believed she would be absent from work more than three days a month (Tr. 431).

However, Dr. Peterson's own treatment records of plaintiff, with plaintiff herself describing her condition to the doctor, are inconsistent with and contradict the severity of limitations he indicated in his opinion. In October 2010, plaintiff told Dr. Peterson her baby was 19 months old and she was feeling "pretty typical" for having two kids (Tr. 308). She was receiving unemployment benefits, which is inconsistent with her claims of disability (Tr. 308). Johnson v. Chater, 108 F.3d 178, 180-181 (8th Cir. 1997). Plaintiff said her cataplexy was not as bad because she was aware of it, and if something was really funny and made her laugh, she sat to

2

avoid falling (Tr. 308). In contrast to Dr. Peterson's opinion, she did not say that stress activated her cataplexy (Tr. 308, 431). To stay awake, she used caffeine or physical activity (Tr. 308).

On the Epworth sleepiness scale of 0 to 3[1], plaintiff reported the likelihood of falling asleep while watching television was one; while sitting inactive in a public place was one; as a passenger in a car for an extended time was one; while sitting and talking to someone was zero; and in a car while stopped in traffic was zero (Tr. 309). Plaintiff's own response to this sleepiness scale, which show no likelihood of falling asleep while being active (i.e., talking to someone, driving) are inconsistent with Dr. Peterson's opinion that she could not work at all (Tr. 430).

At her next visit on April 12, 2011, plaintiff told Dr. Peterson that Nuvigil medication was working great, and she was energetic and awake (Tr. 302). If something was really funny and made her laugh, her cataplexy caused her to fall, but since she was usually sitting when watching a comedy, that generally was not a problem (Tr. 302).

When plaintiff next visited Dr. Peterson in December 2011, she reported being tired all the time since she stopped taking medication (Tr. 293). She napped when she was not taking care of her children (Tr. 293). Dr. Peterson changed her medication and recommended she apply for disability benefits (Tr. 297). She was in a motor vehicle accident on December 30, 2011 and underwent physical therapy in January and February 2011 (Tr. 388, 399-408). Plaintiff returned to Dr. Peterson's office on February 27, 2012 and saw his nurse practitioner, Jill Miller (Tr. 382). Plaintiff said she had just started her new medication three days earlier and had not noticed a

---

[1] 0 indicates no chance of dozing; 1 indicates slight chance of dozing; 2 indicates moderate chance of dozing; and 3 indicates high chance of dozing. EpsworthSleepinessScale.com, http://epworthsleepinessscale.com/epworth-sleepiness-scale.pdf (last visited Mar. 24, 2016).

3

change yet (Tr. 392). Ms. Miller counseled plaintiff on improving sleep hygiene, regular exercise, a healthy diet, and taking her new medication (Tr. 386-87). Plaintiff discontinued all her medications in March 2012 due to side effects (Tr. 410, 413). She talked to Dr. Peterson on the phone in April 2012 and said she was feeling better but was still tired and did not feel well enough to get a job (Tr. 439). Plaintiff visited a psychiatrist on May 9, 2012, and reported doing substantially better with all her symptoms (Tr. 433). In fact, she said she felt better than she had in years (Tr. 433).

When plaintiff visited Dr. Peterson in August 2012, she reported that diet, exercise and control of her body temperature controlled her symptoms (Tr. 20, 436). She told Dr. Peterson she had no sleep intrusions or cataplexy, and was exercising four to five times a week for thirty to sixty minutes (Tr. 20, 436). She was staying awake pretty well, and as long as she did not overheat, she was okay (Tr. 436). She was not drowsy while driving or sitting quietly or reading (Tr. 437). Plaintiff was taking a course to become a substitute teacher (Tr. 436). Dr. Peterson believed things had evened out and were working exceptionally well (Tr. 438).

The objective evidence also shows that plaintiff's symptoms were controlled until she stopped her medication in December 2011, but diet, exercise and lifestyle changes were controlling plaintiff's symptoms by May 2012. She felt well enough to become a substitute teacher and reported low or zero chance of falling asleep while engaged in activities. This evidence contrasts with Dr. Peterson's opinion that plaintiff was having three-to-four episodes per week (Tr. 428).

She left a previous job because it was too far from her house and left the job before that because she had her daughter (Tr. 42-43). Stopping work due to a reason other than the alleged disabling impairment weighs against a claimant's credibility. Eichelberger v. Barnhart, 390 F.3d

584, 590 (8th Cir. 2004) (claimant stopped working at same time she became primary care giver to her grandchild); Depover v. Barnhart, 349 F.3d 563, 566 (8th Cir. 2003) (plaintiff left job not because of disability, but because the work was seasonal and the season ended).

Plaintiff's activities and functioning were also inconsistent with Dr. Peterson's opinion. She ran a four-kilometer race and was training for a triathlon (Tr. 20, 436). She went to a funeral in Omaha, took a trip to Hawaii, and took a long train ride (Tr. 20, 50, 402, 405). She cared for two young children and three cats, and sometimes babysat her friend's young children (Tr. 20, 37, 48, 50). She took her child to school and swimming lessons, volunteered at church, taught a youth group, made blankets and dresses, and used Facebook (Tr. 20, 48-49, 376). Plaintiff told her therapist that medication had given her "so much energy", and she was leading a church initiative to help a homeless family (Tr. 357-358). She testified that she worked as a substitute teacher and only turned down work when she was assigned middle school classes, rather than high school classes, because the students were disrespectful (Tr. 38, 60). These activities are inconsistent with Dr. Peterson's opinion that plaintiff could not work any hours at all and could not handle even a low stress job (Tr. 430-431). See Toland v. Colvin, 761 F.3d 931, 936 (8th Cir. 2014) (activities inconsistent with opinion).

The ALJ properly accounted for plaintiff's narcolepsy and cataplexy when assessing her RFC. The RFC determination is an administrative assessment, based on the totality of the evidence, of the extent to which the claimant's impairments and related symptoms affect her capacity to perform work-related activities. Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007); Social Security Rulings ("SSRs") 96-5p, 96-8p. This assessment is reserved to the ALJ. 20 C.F.R. § 404.1527(d). An RFC is not a decision about whether a claimant is disabled; it is about what a claimant can do despite her limitations. 20 C.F.R. § 404.1545(a). Plaintiff bears the

burden of proving her RFC. See 20 C.F.R. § 404.1520(a)(4)(iv); accord Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). Plaintiff cannot meet her burden of proving her RFC with her subjective statements; she must have supporting "medically determinable" evidence. See 42 U.S.C. § 423(d)(1)(A); SSR 82-58; see also Brown v. Shalala, 15 F.3d 97, 99-100 (8th Cir. 1994) (plaintiff failed to provide "medically acceptable" evidence to support claim). Here, the ALJ accounted for plaintiff's impairments by finding that she could not work in environments with even moderate exposure to temperature extremes, especially heat; climb ladders, ropes, or scaffolds; or work at unprotected heights or around hazards (Tr. 18).

Plaintiff's own work history supports the ALJ's determination. Plaintiff was diagnosed with narcolepsy in 2003 (Tr. 43-44). However, she worked until 2010 (Tr. 40). See Shearf v. Astrue, No. 1:07CV168 LMB, 2009 WL 736697, at *9 (E.D. Mo. Mar. 18, 2009) (unpublished) (claimant worked with narcolepsy). She thereafter received unemployment benefits, which is inconsistent with her claims of disability (Tr. 308). Johnson, 108 F.3d at 180-181. Plaintiff testified that she did not miss a lot of work at her last job (Tr. 40-41). She also did not report any absences or extra breaks when working as a substitute teacher during the adjudicated period (Tr. 38, 56). Specifically, plaintiff said there was only one time when she felt like she might have to leave because the classroom was too hot, but she never actually left (Tr. 57-58). Notably, the ALJ limited her to cool environments (Tr. 18). Plaintiff also said she only taught about two to three times a week because teaching more frequently did not work well with her family (Tr. 56). Plaintiff's unemployment based on her desires to tend to her family does not entitle her to disability benefits. See 20 C.F.R. § 404.1566(c); see also Cronkhite v. Sullivan, 935 F.2d 133, 134 (8th Cir. 1991); Glassman v. Sullivan, 901 F.2d 1472, 1474 (8th Cir. 1990). Thus, plaintiff's own testimony on this issue actually supports the ALJ's RFC assessment.

In sum, the record demonstrates that the ALJ properly considered all of the evidence and accounted for all of the limitations the record established. Plaintiff's arguments to the contrary amount to a request that the Court impermissibly reweigh the evidence in plaintiff's favor. *See* Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992); Hurd, 621 F.3d at 738 (citing Howard, 255 F.3d at 581).

Based on the record, it is the court's view that the Commissioner's decision is supported by substantial evidence.

It is therefore

ORDERED

Affirmed.

April 27, 2016

Edward J. McManus, Judge
UNITED STATES DISTRICT COURT